Good morning. May it please the Court, my name is Thomas Sebaugh and I represent the appellant Samantha Vazquez. May I please reserve two minutes for rebuttal? Sure. Samantha Vazquez's constitutional rights in this case were violated when she was subjected to voyeurism, grooming and solicitation for sex by a guard at Juvenile Hall. No reasonable corrections officer could possibly believe that this conduct was lawful. An officer who abuses his authority in this way and the power entrusted to him in this way knowingly violates the law and is not entitled to qualified immunity. This conduct is offensive to human dignity and shocks the conscience under the 14th Amendment. The decision below suggests that there is some level of sexual abuse of and that sexually abusing juveniles is something that a reasonable officer might do and that decision is fundamentally wrong and should be reversed. So counsel it appeared that the district court was of the view that the specific touching was not of a sexual nature because the district court referenced I think a touch on the shoulder and a touch on the district court's apparent determination that those were not touchings of a sexual nature. Well first I would say that there is the fact that he tried to have sex with her. Well I wanted to could I focus your focus on what I asked you first? Yes your honor. The there is a case called Fontana which I think is instructive or a helpful reference point in this regard where a police officer had a handcuffed person in the back of a patrol car and in the back of the patrol car made sexual comments and sexually harassed that person and also massaged that person on the shoulders and that was a case where this court had found that that conduct was infringed on a fundamental constitutional right to bodily integrity and privacy and was unconstitutional. I don't think that the concept of non-sexual touching is any kind of technical term in this as Dr. Creswell said what does it even mean non-sexual touching? He didn't touch her on an erogenous area but he did make her uncomfortable and the touching was inappropriate. The touching occurred during in the context of a weeks-long campaign to try to have sex with this ward in juvenile hall which included the touching which was a part of his way of familiarizing himself with her and ingratiating himself with her and so we think that the touching in itself whether or not that would be unconstitutional or not is not really the issue that we're asking this court to decide the issue is whether this entire this campaign of sexual harassment and abuse which included a solicitation for sex and included the touching was unconstitutional we think it does shock the conscience. Let me ask is your let's see if I understand the complaint correctly you had two basic claims is that right? I'm sorry your honor two basic claims? Yes. Well there if I understand the court's question there is we've identified two areas of conduct two areas of conduct that are particularly egregious one is these the fact that he solicited her for sex and attempted to persuade her to have sex with him while she was a ward at juvenile hall and he was a corrections officer in juvenile hall and the other conduct was what we've described as the voyeurism or the fact that he was invading her I should have said so so you have a right to you have a kind of a privacy claim under the 14th amendment right? Right. And then you have the sexual abuse claim under the 14th amendment right? Two different claims essentially or are they connected? Well we think that they should be evaluated together as one course of conduct or one the circumstances and events that violated her constitutional rights and that traumatized her she now has she has a lasting psychological trauma as a result of these experiences and I we do think that one one let me see if I can clarify you're talking about one claim based on violation of two rights the right to be free from sexual abuse and the right for bodily privacy right? Right. Well I think and then you consider all the circumstances with regards your underlying claim violation 14th amendment. Right well the the 14th amendment does protect the right to bodily integrity and privacy and I would say that right includes the right to be free from sexual abuse that would include the right to be free from solicitations for sex by corrections officers at juvenile hall it would also protect someone from the right from being the subject or the victim of voyeurism by a corrections officer in juvenile hall so whether these I don't know if it's dispositive whether these are classified as two different rights or the same right but the it's correct that both of these types of conduct would be evaluated under the 14th amendment shocks the conscience standard. Right and everybody there's really no dispute it's the 14th amendment that applies here. Right the parties agreed the district court agreed the law of the circuit is Gary H that this case would be evaluated under. By the way what was her status in the juvenile hall the facility? Her status was as a ward. The ward. Ward is the is the term under California law. What does that mean exactly? Well under California law under the welfare institutions code wards of court are are not subject to a penal system they're not to be housed in a penal institution and the language of the California welfare instance welfare and institutions code is that they are entitled to a a safe and home-like environment. So every everyone who is in the facility is classified as a ward is that there was that wasn't a special category for her that's everyone there is classified as a ward. That's correct your honor so she she is a ward in juvenile hall this is a non-criminal status in California there the idea is for her to have a home-like environment and to rehabilitate children and and juveniles who are in troubled situations or have found themselves in need of help. Was she also classified as a detainee which is one of the terms that all the cases use in between someone who's been convicted and someone who's not yet been convicted? Well in in Gary H this court held that the this that nuance of the status is not going to change the the standard that's applied. All wards because she's a ward right all wards in the in California's juvenile system pre-conviction or post-conviction or whatever they're at any point during their journey through the juvenile system they're wards and they're protected under the 14th amendment. Those cases that deal with detainees should apply to a ward the standards? Well there are cases involving referencing well so at least the same protection as a detainee would get. Right so my colleague from the American Civil Liberties Union I understand will argue that the the standard for wards or for juveniles in general should be higher than for adult pre-trial detainees even though their claims are both analyzed under the 14th amendment. But we do think that the cases involving the 8th amendment are less helpful. Those are cases involving adults post-conviction and this court in Byrd has said that that is the standard for pre-trial detainees and juveniles is higher. So where where if you could just zero in quickly where did the district court go wrong? Well the the district court seems to have believed that since the officer did not actually succeed in molesting Miss Vasquez that there this was a no harm no foul type situation but that's not where the line is or should be as this court has said in cases such as Fontana, Schwenk and Sepulveda there is no legitimate penological purpose at whatsoever for sexually predatory behavior by guards. That's that infringes on the fundamental protected constitutional interest. So that's where I think that and of course the district court also relied upon a number of 8th amendment cases in evaluating Miss Vasquez's claims. 8th amendment cases that have found a constitutional violation are potentially helpful because we know that a 14th amendment standard is higher but where the where this court has found that conduct does not violate the 8th amendment that is not necessarily helpful information in determining whether the conduct would violate the higher 14th amendment standard. Did you want to address qualified immunity for a moment? Well that the qualified immunity argument that I mean Mr. Anderson comes into court and says that nobody I didn't know that I wasn't supposed to try to have sex with the wards at juvenile hall and that was a that was a that was an argument that this court in Schwenk called quote both both legally and a matter of common sense. This court said that that argument is both legally and as a matter of common sense absurd which is strong language for a judicial decision. But we don't think that Mr. Anderson needed to be told that he shouldn't try to do the things he did. Did he actually say that he was unaware that he couldn't try to have sex with a ward? Were those his words? No. He he's asking the court to grant him qualified immunity. Exactly. But but he didn't make the argument that he he didn't know it was impermissible to have sex with one of the wards. That is that is the implication we're saying. Well I'm just saying that that sort of misrepresents the record to say that he comes in here saying he didn't know that it was impermissible for him to have sex with a ward. Well, thank you, Your Honor. I don't Did you? Go ahead. It was not my intention to to do so. My the implication my argument is the the logical implication of the assertion of qualified immunity in this case would be to say that this is something that a reasonable officer would not know not to do. That this is something a reasonable officer would do. Okay. This is an argument that in Schwenk the the court described as absurd. You wanted to share some time. Yes. Thank you. With the amicus from the ACLU. In Kissel for amicus, ACLU of Southern California, and may it please the Court. Just how much sexual misconduct are State officials constitutionally permitted to perpetrate against teenagers in the juvenile justice system? When ruling on Samantha Vasquez's appeal, this Court should make clear that the answer is none. If this Court adopts the district court's opinion, it would permit State officials to engage in a shockingly broad range of sexual misconduct against teens in custody without fear of liability, including verbal harassment, physical touching, voyeurism, grooming for sex. In addition to the attempt or solicitation at sex alleged by Samantha here, we urge the court to do three things in its ruling. First, this court should affirm a clear standard for evaluating challenges brought by those like Samantha who were detained in a juvenile justice system intended to promote healthy growth and development. The 14th Amendment is violated when official misconduct constitutes a substantial departure from accepted professional judgment practices and standards as set out by this court in Gary H. Second, this court should hold that any amount of sexual harassment and sexual abuse of juveniles is unconstitutional, including that alleged here. And third, that State officers were on notice of the illegality, including because no one thought that these things — that it was lawful to do these things to a teenager, and thus defendants should not be shielded by qualified immunity. Ginsburg-McCarrick. Counsel, do you not think that our current cases cover those bases that you've articulated for us? McHenry. Your Honor, I do believe that this case falls squarely within Gary H.'s standard, which — which cites to Youngberg. But as to the clarity of the legal standard given the — the cases decided in the intervening years, there are a number of specific considerations that we would urge this Court to reference in resolving it and affirming the Gary H. standard. One is that the Court's reliance on the Eighth Amendment cases is an apposite. Clearly, after Kingsley and this Court's decision in Castro, it's — there's no question that the 14th Amendment standard is more protective for adults, and we would urge this Court to make clear that it must be yet more protective of children for at least two reasons. First, the Supreme Court's decision in Schall makes clear that, unlike a pretrial detainee, for example, for whom the State has an obligation to essentially maintain the status quo, here, because young people are still growing and developing and because the longstanding principle of the State's parents' patriot interest, the State has an affirmative obligation to promote their healthy growth and development, which — which places a higher obligation on the State and, therefore, a higher standard for evaluating conditions. So how would you articulate this higher standard? Well, I think, Your Honor, that the Court's recognition that the Youngberg test in Gary H. is applicable here would be the appropriate standard. That is when official misconduct constitutes a substantial departure from professional judgment practices and standards. I think that test allows this Court to reflect both the heightened obligations under Schall, as well as the Supreme Court's jurisprudence in Roper, Graham, Jackson, Miller, Montgomery, JDB, that the differences between adolescents and adults are universal, and, therefore, that the State's heightened obligations should be reflected in any legal standard evaluation. But how would that professional judgment be measured? What norms would we use to — as comparators? Certainly, Your Honor. Well, this — this case's decision in Gary H., as well as the Supreme Court's decision in Bell v. Wolfish looking at pretrial adult detention, reference the — the acceptable invocation of professional standards. We would submit that the Prison Rape Elimination Act and its implementing regulations are an appropriate set, as it relates to the definition of sexual harassment and abuse, an appropriate way to set that baseline. But wouldn't that be a little bit inconsistent with that act inasmuch as it articulates that there's no private right of action under that act? Well, thank you, Your Honor. First, we're certainly not placing an equal sign between the statute and the Constitution, and we're not suggesting that Samantha had a private right of action. We're invoking PREA for its relevance to evaluating what those professional judgment and standards would be from which this conduct constituted a substantial departure. Now, this Court in Byrd invoked the Prison Rape Elimination Act Commission report, a report carried out pursuant to the statute as persuasive, and — and that report found children ill-equipped to deal with the sexual advances of adult caretakers. PREA sets termination as the default disciplinary sanction for staff engaged in sexual abuse, and — and those standards which set a baseline of zero tolerance for sexual harassment and abuse are the — are appropriate guidance for this Court in evaluating what — just what the baseline is for appropriate treatment. And it's consonant with the California state's obligation for youth to be provided rehabilitative treatment. My colleague invoked the provision regulating juvenile hall as a home-like environment. For these reasons, the allegations that Samantha was subjected to sexual harassment and abuse by a nearly 300-pound man with a tear gas weapon on his belt and nearly absolute power over her constitute a substantial departure from those standards. This Court's decision in Schwenk and Fontana, which my colleague have invoked, contain useful language indicating that there's really no situation that would justify any amount of purposeful sexual or verbal physical predation against the detainee because there's no government interest that could justify abuse of the one-sided power arrangement that arises from a custodial situation like that experienced by a juvenile here. Mr. Kasich, you recognize the Eighth Amendment provides a certain level of protection? We certainly recognize, Your Honor. Yes. And the fourth, even greater level, higher level of protection. Are you now suggesting there's a third level for the wards? You're asking us to go one step further? Your Honor, we're suggesting that the interests that the Supreme Court and other courts have recognized as animating the State's obligation in relation to the detention of juveniles necessarily implies a more protective application of the Fourteenth Amendment standard. The answer is yes. Yes. You want us to enunciate a new rule with regard to wards? We ask this Court to affirm Gary H., but recognize those heightened obligations. Okay. If the Court determined that the standard, the one, the protection given to detainees was more than sufficient to reverse this and instruct the lower court, would that be sufficient? And so we don't have to take the next step that you're suggesting? Certainly, Your Honor, we're not suggesting that this conduct would be constitutional if alleged by an adult detainee. The application of Gary H. and the affirmation of that jurisprudence would be, I believe, acceptable as well. I do want to briefly address qualified immunity and still try to leave my colleague some time for rebuttal. And just underscore that we see nothing in the purpose of qualified immunity. It's served by qualified immunity here. It's a doctrine intended to safeguard the government and protect the public at large. And we see no reasonable officer could have thought that an attempt at sex and the other sexual harassment and abuse alleged here were lawful. You know, first, the record shows that trainings and policies prohibited it. The PREA regulations, as we've discussed, prohibit in this court in Drummond and the Supreme Court in Hope v. Pelzer and Wilson v. Lane have made clear that such guidance can establish illegality and notice of illegality. If any reasonable officer would have known of the illegality in Hope v. Pelzer of hitching someone to a post in a prison yard, we would submit that sexual harassment and abuse of a teenager detained by State officials is similarly obviously and inherently cruel, wanton, and antithetical to human dignity. In the alternative, we would point to cases invoked by my colleague as establishing a clear consensus of authority and fair and clear warning. Those are Fontana, Sepulveda, and Schwenk. This is not a case involving split-second decision-making, Your Honors, or where government officials need, in the word of Al Kidd, a breathing room to make reasonable but mistaken judgments about open legal questions. Simply put, the sexual harassment and abuse of teenagers in custody is unconstitutional, and that is sufficiently clear, obvious. Okay. Thank you. Thank you, Your Honor. Good morning, Your Honor. My name is James Wheatley. I'm appearing for George Anderson. I'll be arguing the claims against George Anderson only. I'm not going to address the cost claims. That'll be addressed by Ms. Rivera, who's representing the County of Kern and Heath Appleton. And I just want to point out that the facts in this case aren't greatly in dispute, but we brought this up on a motion for summary judgment. So we recognize that we have to take the facts, as Ms. Vasquez has told them, and look at the evidence in light most favorable to her. We've done that at the motion for summary judgment, and we've done it in our appellate brief here. Basically, what this boils down to, according to Ms. Vasquez, is George Anderson used words without threats. He possibly viewed her without evidence of actually viewing her, and he made no comments of any non-sexual, non-harmful physical contact with her. Well, that's your interpretation of the facts. Well, I'll go into the facts. And, okay. But we're here on an issue of law. You understand that, right? Right. Summary judgment. Let me ask the question that was brought up with Mr. Seabrough. Is it Mr. Anderson's position that he did not know that the conduct of which the plaintiff or the appellate accuses him of was something that was in violation of the Constitution, the Fourteenth Amendment? He never addressed that. He never talked about it. No, my question is, is it your position that he did not know that conduct that's alleged here, and there's apparently some proof to that effect, conflict of fact maybe, but some evidence to the effect that he made a sexual advance toward Ms. Vasquez, asked for sex, tussed her without being invited to touch, engaged in voyeurism and things of that nature. Is it Mr. Anderson's position that that is something that does not violate the Fourteenth Amendment? Words like voyeurism and making contact for sexual purposes are conclusions. I understand. I understand that. I'm saying, assuming the facts show those facts, that conduct, is it Mr. Anderson's position that that is not a violation, an obvious violation of the Fourteenth Amendment? I feel reluctant to say anything because I want to talk about the facts and not conclusions. We're here on a summary judgment, not a factual. We have to take the facts as Ms. Vasquez presents them, give her all reasonable inferences, correct? Right. And she has said that all these things that Mr. Anderson is accused of, that he made sexual advances to me, he viewed me in the shower when there was no reason to view me in the shower, put me between his legs, suggested he had a dream and that he wanted to make, he should make this dream come true. The dream was to have sexual intercourse with Ms. Vasquez. Assuming all that is in the record, is it Mr. Anderson's position that that is not a clear violation of the Fourteenth Amendment? Yes, under the facts of this case. And I can go through the specific facts. The facts here, according to Ms. Vasquez, the actual facts that she's claiming against Mr. Anderson is he told her about his personal life, he suggested that she leave her boyfriend for him, he called her babe and made comments about her looks and appearance, he giggled at her, he watched her in the shower, he took his shirt off in front of her, but she actually said that what she actually said was she walked in on him when he was changing his shirt, he touched her on the face and shoulders without her consent, and he told her he had a dream about her that he wanted to come true. Those are the facts that she's claiming, and under the case law --- How many on her big butt? But under the case law, those facts do not give her to use the shower that would allow him to look at her taking a shower, right, telling her about an R-rated dream that suggests a sexually implicit dream that he wanted to have come true. Right. And under the case law, those facts do not give rise to the- He opened up his knees and she was right in the middle of him when she opened up his knees. Under the case law, those facts do not give rise to a constitutional violation. What case supports your argument that having a young lady stand between a guard's legs, touching her on the face, is nonsexual? What case supports that theory? Well, the cases of- The case of Carr v. Towsley, where the district court said that making homosexual- Is the district court case the best case you have? No. We have Gout v. Son, which is a Ninth Circuit case. Is that the strongest case you have to support your argument? There's a number of cases. Well, tell me your strongest case that you have to support your argument that this is nonsexual conduct. Hawkins is an Eighth Circuit case- Well, we don't want an Eighth Circuit case. Tell me the strongest case in the Ninth Circuit that supports your argument that this is nonsexual conduct. The Watson case that we've provided the citation this morning to the court and to counsel, this was a case that was cited in the motion for summary judgment, referred to by the district court. Why was it cited this morning? Because, frankly, when I read the brief, I realized we didn't put it in the brief. But it was some- You see the disadvantage? I've not read that case, because the first I heard about it was about ten minutes before 9 this morning. It's not particularly helpful. I'm sorry. It's not particularly helpful because I didn't see it and even know about it until about ten minutes before we walked in. I apologize. It was a case that was referred to by the district court in the motion for summary judgment ruling. It was a case that we cited in our motion for summary judgment, but it wasn't inserted into the brief. If this is your strongest case, I'm curious that it wouldn't be in your brief. I — this is a case where a male prisoner claimed that a male guard entered his room while he was sitting on the toilet and began searching the room. The inmate asked the guard to leave while he was still on the toilet. The guard came over and rubbed the inmate's thigh and smiled at him in a sexual contact and laughed at him as he left the cell. Okay. And that — was that an Eighth Amendment case? No. This is an — Was he convicted? I believe it was an Eighth Amendment case. Different standard, right? Not really. Not under Gary H. Excuse me. Cruel and unusual punishment is prohibited. Right. Under Gary H., that is a standard to be applied in a Fourteenth Amendment case. No. I don't think so. That's not true. Is that your basic premise, that if — that we only — we have to rise to the level of the — action has to rise to the level of cruel and unusual punishment for a ward of the State? Gary H. specifically says the Due Process Clause, which implicitly incorporates cruel and unusual punishment clause standards as the constitutional minimum, is the appropriate standard. But what about Castro? Castro now makes a distinction between Fourteenth Amendment cases and Eighth Amendment cases. So how — how does that affect your argument? Castro applies an objective standard, which actually helps our argument, because what that says is the actual intent of Anderson is not relevant to whether a constitutional violation was committed. So you're saying that the Fourteenth Amendment standard is stricter than the Eighth Amendment standard? No, no. What I'm saying is that if you use an objective standard, what that means is we do not look at the intent of George Anderson. What we look at are just the facts. We look at whether a reasonable person in his position would have considered this to be appropriate conduct. Of these facts. That doesn't help you. Well, of these facts. Not — not the intent of George Anderson, not the conclusionary language that's used, like voyeurism. But there's nothing conclusionary about saying a prison guard had a young girl stand between his legs while he told her about a sexual dream that he wanted to come true. That's not — that's not conclusory. That's what happened. What's conclusory about that? When there was no threat, in the case of — It doesn't have to be a threat for it to be sexual. For something to be sexually abusive, it does not have to be accompanied by a threat. If someone invades your personal space in a sexual manner, the threat can be inherent in the fact that there is an imbalance of power between them. She has no avenue to retreat, nowhere to go, no one to turn to. Why isn't there a threat implicit in the relative imbalance of their positions? Well, the Hawkins case says that the threat, if you — if you suspect something — and Hawkins, again, was a sheriff who was sexually touching staff, both male and female, and making sexual comments to them. They said they were fearful of him because he was a sheriff. And that court said that's not enough. But that's different. They were not captive. This young lady was captive. Those people could quit their jobs if they — they went home every day. She had nowhere to go. She said by — when that event supposedly happened, she just backed up, walked away, and left. Left that vicinity, but she couldn't leave the facility. She never once — never once did she say that George Anderson threatened her in any way. You suggest that we should use the Eighth Amendment standard, cruel and unusual punishment, because the case is — Well, there's — Wait. Can I finish? There is — May I finish? Let — May I finish? Assuming, for purpose of this next question, that it's not the Eighth Amendment, cruel and unusual, but rather a higher standard set forth by the Fourteenth Amendment, no punishment to a detainee or a ward, does that end your case in the  Yes. Okay. Because the courts, in using the Gary H. case and the court — the cases that we've cited here, the courts analyzed these cases both under the Fourth, the Fourteenth, and the Eighth Amendments. And — I think the problem that we're having is I interpret these cases, say, that the Eighth Amendment is the minimum, and then when you go to a violation of the Fourteenth Amendment, the standard is higher. And I — are you familiar with the Demery case? No. Well, my colleague here just — has wrote this case, and I'll tell you what he said. He said, the Ninth Circuit — in the Ninth Circuit, there's a critical distinction between claims brought by pretrial detainees — and I would add to that N wards of the state — under the Fourteenth Amendment's substantive due process clause, and claims brought by convicted prisoners under the Eighth Amendment. Because, to quote my colleague, the Fourteenth Amendment prohibits all punishment of pretrial detainees, while the Fontana Eighth Amendment only prevents the imposition of cruel and unusual punishment of convicted prisoners, close quote. And there is an argument in this case that the Eighth Amendment standard could apply. Remember, what we're dealing with here is not a juvenile. She's not an adolescent, unlike Appellant and Amica's claim. She's an adult. But she was a ward. Huh? She was a ward. She's an adult in a juvenile facility. She's still under the award of the Superior Court, juvenile court. Are there any other questions on the constitutional violation? How about the qualified immunity? You're saying there's no case that is instructive to Mr. Anderson? There's no case that deals — That has facts similar to what's here? That's correct. There's no case with facts similar to the facts that Ms. Vasquez claims that George Anderson did. What the plaintiff cites, too, are Sepulveda, which is a rape case. In Fontana, the Court said there are certain things that are just malum in se. Quote, no reasonable officer could believe that this conduct did not violate Fontana's constitutional rights. So I'm going to answer the same question I said before. Assuming the Fourteenth Amendment applies, is it Mr. Anderson's position that all these things that he's alleged to have done — and there's conflicting evidence with regard to that — that does not rise to a violation of the Fourteenth Amendment? Under the facts that she's alleged, looking at the actual facts, there is not a Fourteenth Amendment violation. So is it your position that there is no sexual abuse absent a threat? No, I don't think there's a constitutional violation absent a threat. Okay. There is no constitutional violation absent a threat. So if sexual abuse occurs, the plaintiff has a remedy in State court. If sexual harassment occurs, the remedy, again, is in State court. That doesn't give rise to a constitutional violation. Would you agree that there's kind of a sliding scale work here? The greater the governmental need — in this case, a penological need for protection or whatever — the lesser standard with regard to what the officers can do. In other words, the more interest the government has, the more leeway they have. Do you agree with that? As a broad general statement, but analyzing the facts of each specific case. And vice versa. If there's no penological interest involved, then the standard is much, much higher for the officer. Would you agree with that in a sliding scale? There's no penological interest, right. What is the penological interest in this case for what Mr. Anderson did? Well, depending on which act you're talking about — What about all of his acts? You can't — here's one of the problems. You don't want to take one act in isolation. You take all of the circumstances. Take all of the circumstances and tell me what's the penological interest in asking someone to make her dream come true. The same penological interest that the Court talked about in the Watson case, the Hawkins case — I want to know what is in this case. In this case, if the Court goes back and looks at the facts, for example, in the viewing of her in the shower, that was described by — My question was directed to the sexual dream that he wanted her to make true. What is the penological benefit to the State or the County? I'm concerned because I'm using up all my counsel's time. Well, just answer that question, and then we'll hear from your co-counsel. That in and of itself does not have a penological interest, but it also doesn't give rise to a 14th Amendment violation under the case law. Counsel, can I just ask you one final question? Is it your position that sexual abuse or sexual harassment can never rise to the level of a constitutional violation in the penal setting? I would never say that, and that's a conclusion — again, it's a conclusionary statement. Well, that seemed to be where you were going, because you said if there's sexual abuse, if there's sexual harassment, there can be a State law claim, but it doesn't rise to the level of a constitutional violation. So when would it rise to the level of a constitutional violation? When the physical contact is sexual or harmful, it would be a constitutional violation, not just touching on the face or shoulder. When the words are actual threats accompanied by the ability to commit a threat, not a fear of somebody because of their position. That's what the Hawkins case is. All right. Thank you, counsel.  Let's hear from your co-counsel. Good morning. May it please the Court. My name is Kathleen Rivera, and I'll briefly discuss Heath-Appleton's supervisory liability and costs if we get to that point. We ask — we are asking this Court to affirm the order of the district court judge granting the motion for summary judgment by Heath-Appleton for two reasons. First, the appellants have not identified a material issue of fact that prevents summary judgment for Heath-Appleton in this case. And second, appellants do not allege the district court judge was wrong on the law. The only issue that the appellants set forth in their brief to this Court is that the district court judge made the wrong inferences from the facts and that the district court judge credited Mr. Appleton, rather, with the wrong facts. And we submit that that doesn't provide a basis for overturning the district court's decision. The counsel, is it fair to say that there was evidence in the record that Mr. Abbott was aware of the actions that were generally aware of the allegedly inappropriate actions that were performed by Mr. Anderson? No, Your Honor. And there are several different areas that were alleged to have been Mr. Anderson's conduct. So with regard to Mr. Appleton's awareness of, first of all, the shower incident. So I'll refer to that as the Virginia Sunder shower incident. So that took place seven months before Ms. Vasquez was ever remanded to Juvenile Hall. So seven months before, Mr. Appleton became aware that Mr. Anderson was the only male guard on a unit housing female wards. Policy in Juvenile Hall was never should a guard of the opposite sex be the only guard on a unit with wards of the opposite sex. How is it that it took seven months for him to learn that? No, Your Honor. I think there's a — that's not a correct statement of the record. Mr. Appleton addressed the issue with Mr. Anderson at that time. Seven months later, Ms. Vasquez came into Juvenile Hall. So — So he was aware that there were allegations that even before Ms. Vasquez came into the facility, the supervisor was aware that Mr. Anderson had been viewing wards of the opposite gender. No, Your Honor. What Mr. Appleton was aware of was that Mr. Anderson violated the policy to be the only male guard on the unit. At the time, females were directed to shower by Mr. Anderson. The employee that witnessed that, that brought it to Mr. Appleton's attention, was Ms. Virginia Sunder, but she did not view where Mr. Anderson was on that unit. She was in an adjacent unit, and she heard Mr. Anderson direct wards to go take their showers. None of those wards reported that Mr. Anderson viewed them. There's no facts in the record that Mr. Anderson was positioned to where he could view the wards. And, in fact, Ms. Sunder, during her deposition, acknowledged that she did not view Mr. Anderson viewing the wards. So that's the shower incident. Which of the — I can't remember specifically the names, but which one of the coworkers wrote down an incident on a napkin about inappropriate behavior of Mr. Anderson? That is Ms. Sunder, yes. And my time is up. Would you like me to just answer your question more fully? Please. So what Ms. Sunder did at that time, according to her testimony, was she jotted down what happened, that she heard Mr. Anderson tell wards to go shower. Again, she was on an adjacent unit. She didn't walk over to Mr. Anderson's unit to talk to him about that. She jotted it down, and then she called Mr. Appleton the next day, who was the supervisor, and said, this is something that I overheard, I'm concerned about it. And Mr. Appleton, it's uncontroverted that he talked to Mr. Anderson about it. And nothing like that ever happened again. The facts with Ms. Vasquez were that Mr. Anderson was present on the unit with male — female guards, that he was not the only male guard. She alleges that he viewed her in the shower not at a time when he was, again, violating that policy, at a time when he was — So he took a particular interest in her. Well, that's her statement. Well, it sure looks like it. Well, Mr. Anderson also was a guard who was knowledgeable in gang and gang gathering of information. And Ms. Vasquez, it's undisputed that she had numerous occasions to be housed at Juvenile Hall. She and Mr. Anderson were acquainted with each other from before this particular visit to Juvenile Hall. And, in fact, he was also acquainted with her brothers who had been remanded to Juvenile Hall. He gathered gang information while he worked with these wards and then provided them to members of Kern County law enforcement. And it also served as a safety — it served a safety purpose in Juvenile Hall for him. So his interest was in obtaining gang information. Well, that's part of the reason why Mr. Anderson worked with wards, was obtaining gang information. But second of all, these wards were learning a skill. They were — Juvenile Hall is an old building, and it needed painting, repairing. Mr. Anderson would teach wards, girls, boys, many wards beyond Ms. Vasquez, how to chip away old paint, paint cells, and that provided a valuable purpose to maintaining Juvenile Hall. And wards did numerous details besides this. They participated in laundry, kitchen cleanup. So wards were taught to take care of the facility where they were housed. Counsel, what do you make of the district court's observation that the evidence suggests that Appleton had reason to know that Anderson's directing other wards to shower constituted misconduct under the policies in place? Why isn't that enough to raise a material issue of fact? Well, the difference — the reason it's not enough to raise a material issue of fact is that, yes, it was a violation of policy for Mr. Anderson to direct wards to shower when he was the only male guard on that unit. However, Ms. Vasquez's claims, taking place seven months later, did not concern that policy at all. So for supervisor liability to be imposed on Mr. Appleton, he has to act with deliberate indifference to a risk of constitutional — a violation of constitutional rights of Ms. Vasquez's constitutional rights by Mr. Appleton's actions of disregarding a policy violation. So the incident with Ms. Vasquez doesn't concern that policy violation. That was an even more egregious violation of the policy if he directed her to go into a shower where he could view her for his own gratification. If that is taken as true, and for purposes of summary judgment we have to take that as true, that seven months later, after the Virginia Sunder incident, that Mr. Anderson directed Ms. Vasquez to go into a specific shower stall, that would be a violation of policy. There's no facts in the record indicating that Mr. Appleton knew about that or had reason to know about that. No one had brought that to Mr. Appleton's attention, that Mr. Anderson was directing wards to go into a specific shower that had a gap that allowed a guard to view from a certain point at the staff counter. That's the allegation to view into that shower. That isn't a fact that was brought to Mr. Appleton's attention, or the — there's no facts in the record that he had any reason to know of that. So therefore, supervisor liability can't be established on the basis of what he may have known. It requires personal action by a supervisor. It requires knowledge or reason to know. So if he had been informed previously of misconduct by Mr. Anderson, that would be enough to raise a material issue of fact regarding whether or not he had reason to know that this contact — that this conduct continued or even elevated. Well, I disagree, Your Honor, for the reasons that I stated, that, again, for supervisor liability, there needs to be deliberate indifference to a risk of harm to that specific individual, Samantha Vasquez, by the supervisor due to something that the supervisor did wrong. With Your Honor's analogy, if Mr. Appleton was aware that with the incident that happened seven months before that Mr. Anderson was directing wards to go into a specific shower, then I would agree with the Court. However, those aren't the facts from Ms. Vasquez. It doesn't have to be the same — exactly the same factual scenario. If he's aware that Mr. Anderson is violating the policy vis-a-vis watching inmates shower, it doesn't matter whether it was, you know, by directing them to a shower or by going himself to the shower where he could see. It doesn't have to be a mirror image of the actual event that triggered the notice to him. Even so, Your Honor, there has to be, for acquiescence, for that — for that nexus to be existing between the supervisor's actions and the unconstitutional — to the constitutional violation, there has to be — for acquiescence, there has to be knowledge and inaction. That's what this Court stated in the Starr v. Baca case, that that stated a case for supervisor liability, and that's 652 Fed 3rd 1202, 9th Circuit, 2011. And if I can just finish, what we don't have here is knowledge and inaction, which equals acquiescence. There's no inaction by Mr. Appleton because he did tell Mr. Anderson, don't do that again. And by all accounts, Mr. Anderson never was the only male on the ward supervising females while they showered. Okay. Thank you. Thank you, counsel. We'll put two minutes on the clock for rebuttal. Thank you, Your Honors. What is the evidence that Appleton knew of the violations? Well, there's three things. First, seven months before the incidents with Ms. Vasquez, Ms. Sunder reports to him. Okay. What's the next one? The next is that he — that he is the one who actually — according to Anderson, he's the one who actually authorized him to spend time alone with wards. The policy, 1425N, states that outside of an emergency, staff should not be alone in rooms with opposite-gender wards. That's what the policy says. There's evidence in the record that Anderson's testimony said I was — Anderson testified — I was authorized to do this, be alone. Yeah. Yeah. Who told you — who authorized you? Appleton. Right. And there's also evidence we know from the ward whose initials are A.V. that Anderson was alone with Vasquez all the time he was there. And so given the fact that Appleton is his supervisor, you'd think the supervisor would know where his employees are. But they should have known. Or should have known. The policy that developed was Anderson does what he wants. That's how the — his own colleagues described the culture that developed. When you have a — when sexual abuse takes place, our view is that really two ingredients are necessary. First, you obviously need to have the sexually predatory guard. But in order for that guard to actually act and carry out sexual abuse, a breakdown in the institution needs to take place to provide that officer with the opportunities to carry out the abuse. And in our view, Appleton was instrumental in providing these opportunities by failing to enforce the policy, the policy that prohibited cross-gender viewing in the shower outside of an emergency and the policy that prohibited wards from being alone in the rooms with staff of the opposite gender. If those policies had been enforced, then Anderson would never have had the opportunities to do what he did. And that's why we think that Appleton should be held responsible to some degree for what did happen. Vasquez testified that she was never so scared in her life as she was of Anderson. At the time of these incidents, he was 45 years old, weighed 300 pounds. He wore a uniform. He carried pepper spray. Obedience to his commands was mandatory. Okay. He was a teenager. Go ahead. The two minutes that I put on the clock for you has expired. Thank you, Your Honor. Okay. We've got your argument. Thank you. Thank you very much, counsel. We appreciate your arguments this morning. Matter is submitted.
judges: Paez, Rawlinson, Huck